**In re Michael A. LAMAN and Frances A. Laman, Debtors.**

**Bankruptcy No. 97–39827 RCM–7.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

April 8, 1998.

Cynthia A. Spencer, Garland, TX, for Debtor.

Thomas Powers, Dallas, TX, trustee.

### MEMORANDUM OPINION

ROBERT McGUIRE, Chief Judge.

On March 26, 1998, came on to be heard the United States Trustee's motion to dismiss this case under 11 U.S.C. § 707(b), for substantial abuse. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. Following are the Court's findings of fact under Bankruptcy Rules 9014 and 7052. These findings are for purposes of this § 707(b) dispute only. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (*O*).

This case was filed on October 23, 1997 by Michael A. and Frances A. Laman ("Debtors"). The motion was timely filed by the United States Trustee. Debtors' homestead is located in Rockwall, Texas. It has a value of $118,840, with a mortgage of $110,027. Debtors' schedules show personal property in the amount of $401,387.97, which includes: (a) Mr. Laman's IRA in the amount of $4,900, and Mrs. Laman's IRA of $4,900, both of which are claimed as exempt and not property of the estate under § 541(c)(2); (b) Mrs. Laman's annuity valued at $22,232.97, and claimed to be exempt and not property of the estate under § 541(c)(2); (c) Mr. Laman's retirement through his non-insider employer, valued at $350,382, which is, likewise, claimed to be exempt and not property of the estate under § 541(c)(2).

The parties lease a 1996 Chevrolet Suburban and own a 1994 Camaro with 98,000 miles on it that they value at $11,000. It has a $9,000 lien against it. No objections were timely filed to Debtors' claimed exemptions, and the exemptions are not subject to further objection.

Debtors schedules show no priority unsecured claims, and unsecured debt of $88,-894.76 to twenty-three creditors, all of which appear to be credit card creditors. Thirteen of such credit card bills are over $3,000. Mr. Laman testified that most of the credit card debt is interest. No § 523 actions were

timely filed by any of the credit card creditors.

Both debtors are employed. Mrs. Laman has been employed by a school district for five years. Her take-home pay is $1,934 per month. As of March 26, 1998, Mr. Laman's take-home pay of $4,573 per month, came from his job as a dean at a university. At such university, he has a mandatory payroll retirement deduction of $452 per month. He also teaches at a junior college, where he earns an average of approximately $330 per month. He earns $1,058 per month from a department store, where he has been working every Friday and Saturday nights, and all day Sunday for four and one-half years. For such approximate period of time, he has had only one day free per week.

The Debtors are presently sporadically going through marriage counseling. Mr. Laman credibly testified that he is going to stop working at the department store because it is jeopardizing his dean's job with the university and jeopardizing his family relationships.

He also testified that he is considering stopping work at the junior college, but this appears more speculation than real. Mr. Laman testified that he anticipates filing a divorce this summer, which allegedly would increase his expense figures. This possibility likewise appears speculative at this time. It further appears that, if Mr. Laman were in a Chapter 13 in the future, he could file for a modification if either he or his wife filed for divorce. Whether such a modification motion would be successful is not before the Court.

Thus, it appears that, at present and in the reasonably foreseeable future, the parties net take-home pay is and will be in the range of $6,837 per month. Their expenses are listed at $6,829. (Debtors' Exhibit ("DX")3).

The parties have one 14–year–old boy and 13–year–old twin boys.

### Section 707(b) Standards

■ Section 707(b) of the Bankruptcy Code provides that the court may dismiss a case filed by an individual debtor whose debts are primarily consumer debts, if it finds that granting relief would be a substantial abuse of the provisions of Chapter 7. This provision is one of several consumer credit amendments to the Bankruptcy Code enacted in response to Chapter 7 filings by allegedly non-needy debtors. *See, In re Walton,* 866 F.2d 981, 983 (8th Cir.1989); *In re Fitzgerald,* 155 B.R. 711, 715 (Bankr.W.D.Tex. 1993). Section 707(b) provides that there shall be a presumption in favor of granting the relief requested by the debtor.

■ The term "Consumer debt" is defined in § 101(8) of the Bankruptcy Code to include debt incurred by an individual primarily for a personal, family, or household purpose. The Fifth Circuit has stated that the test for determining whether a debt should be classified as a debt acquired for personal, family or household purposes, is whether it was incurred with an eye for profit. *In the Matter of Booth,* 858 F.2d 1051 (5th Cir. 1988). As stated in the Debtors' schedules, the debts listed are primarily credit card obligations and, therefore, are consumer debts within the meaning described in the Bankruptcy Code.

■ In its December 12, 1994 unpublished Memorandum Opinion in *In re Billy Mitchell Howie and Evelyn Ruth Howie,* Case No. 394–34673 RCM–7, this Court adopted the test followed by the Sixth Circuit in *In re Krohn,* 886 F.2d 123, 126–127 (6th Cir.1989), as the proper standard for determining whether a case should be dismissed pursuant to § 707(b). Under this approach, the Court will examine the ability to repay creditors as the primary factor for dismissing a case. The Court will consider other mitigating factors such as: whether the debtors enjoy a stable source of future income; whether the debtors are eligible for Chapter 13 relief; whether there are state remedies available; the degree of relief obtainable through private negotiations; whether Debtors were forced into bankruptcy by unforeseen or catastrophic events; and whether debtors' expenses can be reduced significantly without depriving them of adequate food, clothing, shelter and other necessities. *Id.; In re Nolan,* 140 B.R. 797, 802 (Bankr. D.Colo.1992). In *In re Krohn,* 886 F.2d 123, the debtor had ample future income and there was a catalogue of debtor excess after the petition was filed, which the appellate

court felt demonstrated debtor was seeking an advantage over his creditors. That court stated:

> The goals of bankruptcy are to provide an honest debtor with a fresh start and to provide for an equitable distribution to creditors. The debtor herein, although he has minimal assets, appears to be seeking a "head start" with no attempt to deal with creditors on an equitable basis.

*In re Krohn,* 886 F.2d at 127–128. *Also see, In re Ontiveros,* 198 B.R. 284, 290 (C.D.Ill. 1996); *In re Carlton, In re Kornfield,* 211 B.R. 468 (Bankr.W.D.N.Y.1997). For the most exhaustive discussion of § 707(b), *see, In re Attanasio,* 218 B.R. 180 (Bankr. N.D.Ala.), an opinion containing 59 Westlaw pages and 97 footnotes. *In re Attanasio* cites *In re Krohn* for the following proposition:

> The courts in *In re Krohn,* 886 F.2d 123 (6th Cir.1989), *United States Trustee v. Harris (In re Harris),* 960 F.2d 74 (8th Cir.1992), and *Zolg v. Kelly (In re Kelly),* 841 F.2d 908 (9th Cir.1988) represent those courts that have held that section 707(b) does not require, for dismissal, egregious conduct or bad faith on the part of a debtor in addition to or aside form the debtor's ability to pay and that the debtor's ability to pay, standing along, will justify dismissal pursuant to section 707(b), in the absence of circumstances that mitigate against dismissal (those being the factors to consider in addition to "ability to pay").

> \* \* \* \* \* \*

> ... [T]he *Green* [934 F.2d 568 (4th Cir. 1991)] courts require aggravating circumstances in addition to an ability to pay while the *Krohn* courts find that the ability to pay, in the absence of unique, mitigating circumstances can, without further inquiry, result in dismissal.

*In re Attanasio,* 218 B.R. at 211.

### Debtors' Expenses

In Debtors' Exhibit 3, Debtors list their expenses as follows:

| | |
|---|---|
| Mortgage payment | $ 1,145. |
| Electricity and heating fuel | $ 200. |
| Water and sewer | $ 78. |
| Telephone | $ 267. |
| Home maintenance (repairs and upkeep) | $ 190 |
| Food | $ 740. |
| Clothing | $ 500. |
| Laundry and dry cleaning | $ 120. |
| Medical and dental | $ 200. |
| Transportation (not including car payments) | $ 520. |
| Recreation, clubs and entertainment, newspapers, magazines, etc. | $ 160. |
| Charitable contributions | $ 200. |
| Life insurance | $ 200. |
| Auto insurance | $ 248. |
| Income taxes | $ 100. |
| Auto installment payment | $ 869. |
| Loan on annuity installment payment | $ 308. |
| DTCU (loan) | $ 225. |
| Business expenses | $ 91. |
| Other: Kids' sports equipment and fees, hair, nails, toiletries, Christmas and birthday gifts, allow., and marriage counseling | $ 468. |
| **TOTAL** | **$ 6,829** |

■ It appears that the following expenses need to be examined in light of reasonableness and whether, if this were a Chapter 13, same would be proper maintenance or support payments under § 1325(b)(2)(A) and (B), in determining "disposable income."

The $267 phone bill is excessive by $87. The Debtors have two cellular phones. Mr. Laman needs one for his work because he travels extensively between campuses on his jobs, and needs to stay in touch with his office. However, two cell phones appears excessive.

The parties have listed $740 per month for food for two adults and three teenage sons. One court has found $750 for four adults excessive. *In re Smith,* 1995 WL 20345, *2. Such court opined that many Chapter 13 debtors can feed five on $500. Another court has found, in connection with the living expenses for two adults and two teenagers, that $850 for food and $150 for clothing was excessive by $300 on the food and $75 on the clothing. *In re Carlton,* 211 B.R. at 470, 479. It appears that such $740 is excessive in the range of at least $125. The clothing expense of $500 per month appears excessive in the range of at least $125.

The unreimbursed medical and dental appears excessive in the range of $50.

The transportation expense of $520 per month, while high, appears reasonable because of Mr. Laman's extensive travel and the age and mileage of the Camaro. There was also evidence concerning home maintenance repairs being made.

The charitable contributions of "at least" $200 would be an improper expense under § 1325(b)(2)(A). (There is some indication of a further payroll deduction for charity in an unspecified amount). *In re McCormack*, 159 B.R. 491, 496 (Bankr.N.D.Ohio 1993); *In re Carlton*, 211 B.R. at 481; *In re Lee*, 162 B.R. 31 (Bankr.N.D.Ga.1993).

It further appears that approximately at least $50 in the "other" last category is excessive. Thus, it appears that approximately at least $635 of such expenses are excessive. When a deduction for excessiveness was made, the effort was made to give the Debtors the benefit of the doubt. For example, it appears that the laundry and dry cleaning of $120 per month may be excessive by at least $50. As indicated, the food, clothing, and "other" allocations were on the high sides, but Debtors were given the benefit of the doubt. Thus, it appears that, in a Chapter 13, the Debtors would have disposable income of approximately at least $635, and, in thirty-six months, $22,860 in payments could be made. Aside from Chapter 13 Trustee's fees, it appears that there would be at least an approximate 25% dividend in a three year Chapter 13. *In re Smith*, 1995 WL 20345 at *2, expresses the opinion that, where the debtor has been able to fund repayment of upwards of 50% of his debts, the courts have dismissed a Chapter 7 for substantial abuse, citing Eighth and Ninth Circuit cases. *In re Smith* further opines that, where a debtor is able to pay less than 50%, but is still able to make a substantial contribution *and* there are aggravating circumstances, the courts have also denied Chapter 7 relief. *Id.* In *Matter of Schmidt*, 200 B.R. 36, 39 (Bankr. D.Neb.1996), an Eighth Circuit case, the court stated:

Therefore, in this Circuit, the primary factor in determining whether granting relief would constitute a substantial abuse pursuant to section 707(b) is the debtor's ability to pay some of his or her debts out

of future income, and the ability to fund a chapter 13 plan can be a sufficient reason alone to dismiss a petition. However, this court does not read *Walton* and *Harris* to hold that anytime a debtor has any amount of net monthly disposable income, dismissal under section 707(b) is warranted. Neither does this court find that the debtor must have the ability to pay off a certain percentage of his or her unsecured debt under a three- or five-year chapter 13 plan. See, *Fonder v. United States*, 974 F.2d 996 (8th Cir.1992). This court has confirmed chapter 13 plans where few, if any, unsecured creditors received any payments as part of the plan. Neither the percentage of debt that could be paid under a plan, the number of creditors holding unsecured claims, nor the amount of the debtor's net monthly disposable income are dispositive of the issue.

*Id.* In *Schmidt*, the court projected a three-year dividend of 25% of the unsecured and granted the 707(b) motion if debtors did not convert. *Id.* at 37 and 40. *See, In re Attanasio*, 218 B.R. 180, 240–41 (exhaustively listing cases discussing debtor's ability to pay various percentage of his creditors). In most of the instances where the three-year projected dividend would have been less than 50% and the court dismissed, there were other aggravating facts in the case. However, in *Schmidt*, there were not other aggravating facts. There were not other aggravating facts or circumstances in the present case.

In *In re Carlton*, 211 B.R. at 477, the court used a combined circuit approach and as part of its § 707(b) tests states:

On a case-by-case basis, the Court will first determine whether the debtor has an "Ability to Pay". For this Court, this equates to the ability to pay: (1) all priority and unsecured debt in a Chapter 13 case under a plan of from one to five years in duration, or over a reasonable period of time in a Chapter 11 case, while properly providing for any secured debt; (2) all priority debt and a significant percentage of unsecured debt through such a Chapter 13 or 11 plan; *or (3) a significant dollar amount, irrespective of percentage, to*

*unsecured creditors through such a Chapter 13 or Chapter 11 plan.*

*Id.* (Emphasis added). It appears that, by reason of § 1325(b)(1)(B), ability to pay within three years is the more appropriate true span test. It appears that Debtors have the ability to pay a significant dollar amount to the unsecured creditors, irrespective of percentage.

With respect to the considerable credit card debt, it appears that same has been run up over a long period of time, rather than under recent suspicious circumstances. Apparently, the build-up started when Mrs. Laman first had the twins and prior to such time she had been fully employed. However, at such time, the parties continued to live at the same approximate expense level, but existed by using the credit cards and just Mr. Laman's salary. As matters got worse, because of the excessive credit card debt, Mr. Laman eventually went to work for the department store approximately four and one-half years ago. As pointed out above, no § 523 actions have been filed by the credit card companies. The *Attanasio* court opines that the Bankruptcy Court should not prosecute a credit card company's non-dischargeability case by way of § 707(b), and that § 707(b) does not say a case should be dismissed if it represents substantial abuse of consumer credit, but rather if it represents a substantial abuse of Chapter 7. *In re Attanasio,* 218 B.R. at 215–219.

### Mr. Laman's Exempt Retirement Benefit of $350,382 and the Lamans' $9,800 in IRA's[1]

As previously indicated, Mr. Laman, at fifty-two years of age, has a present exempt retirement benefit of $350,382, toward which he is allegedly mandatorily contributing $452 per month. The word "allegedly" is used because this was undisputed on the record, although it does seem high for a mandatory retirement contribution. (Mrs. Laman is apparently approximately the same age). Also, the university makes some type of matching contribution to this retirement. In *Attana-*

*sio,* the court talks of the size of a debtor's exempt property as part of the § 707(b) mix:

Some courts have determined that substantial abuse is indicated if the debtor has exempt property that could be voluntarily liquidated to help pay creditors. Section 522(b) of the Bankruptcy Code authorizes a debtor to use either state law exemptions or federal law exemptions without limitation. Therefore, this Court may not assume that Congress intended, by way of 707(b), to punish debtors who utilize the rights to withhold exempt property as specifically provided for them in section 522(b). Under both state and federal bankruptcy law (*see* 11 U.S.C. § 522(I)) a debtor's spouse and children have rights in the debtor's exempt property that require protection and may not be effected by a backdoor application of 707(b). For those reasons, a debtor's exemption of property cannot be a factor that indicates substantial abuse of Chapter 7.

On the other hand, if a debtor owns a great deal of property, there may be evidence of substantial abuse, since, commonly, people who make a great deal of money are those that can afford to buy, pay for, and maintain a large amount of property. Therefore, this factor, or more accurately stated, the fact that a debtor owns a great deal of property, may be relevant in states where the exemptions allowed by state law are very generous and situations in which the debtor actually owns a great deal of property. However, if the amount of property exempted by the debtor is small, or if the state law exemptions of the state in which the debtor resides are not generous, as in this state [Alabama], then this factor does not appear to have great significance.

*In re Attanasio,* 218 B.R. at 226. (Footnote omitted). In footnote 68 of such opinion, the court cites various opinions where retirement plans are involved.

The court in *In re Stratton,* 136 B.R. 804, 805 (Bankr.C.D.Ill.1991), indicated that the debtors had approximately $28,000 in IRA accounts that were claimed as exempt, which,

---

**1.** In *Stuart v. Koch,* 109 F.3d 1285 (8th Cir. 1997), the court held that exempt income should be included in determining whether to dismiss a debtor's case for substantial abuse under § 707(b). In the present case, exempt income is not an issue.

nonetheless, could have been used to pay debtors' obligations. As indicated above, the Debtors in this case have $9,800 in exempt IRA's, which could be utilized now or in the future to pay creditors or supplement family income. In *In re Carlton*, 211 B.R. at 480, the court indicated that the debtor had in excess of $10,000 in retirement funds, all or part of which might have been able to be utilized now or in the future to pay creditors or supplement family income. In *In re Kornfield*, 211 B.R. at 482, the same court indicated that Dr. Kornfield had in excess of $390,000 in retirement funds, all or part of which might be able to be utilized now or in the future to pay creditors or supplement family income.

From the existing record in this case, it appears Debtors could not readily access Mr. Laman's employer retirement funds of $350,382; however, at some time such funds and future accumulations thereon will be accessible by Debtors. For purposes of this record, it is assumed that Debtors will not be able to substantially access such retirement until Mr. Laman's retirement, disability, or death.

### Discussion of the Remaining Krohn Factors

The remaining *Krohn* factors are discussed hereafter.[2] The Debtors enjoy a stable source of future income. They appear to be eligible for Chapter 13 relief. There was no showing that Debtors made any efforts prepetition to negotiate with their creditors. *See, In re Fitzgerald*, 155 B.R. at 716; *In re Krohn*, 886 F.2d at 128 n. 2. However, with the size of their debt and the number of their creditors, it appears Debtors, in all likelihood, would have ended up in bankruptcy.

The Debtors exhibited good faith and candor in filing their schedules and other documents.

Debtors were not forced into bankruptcy by unforeseen or catastrophic events.

Debtors did not engage in "eve of bankruptcy purchases."

It further appears that the size of Debtors' expenses can be reduced without depriving them of adequate food, clothing, shelter, and other necessities.

The *Krohn* Circuit Court, 886 F.2d at 127, stated that, in the *Krohn* case, there appeared to be:

> ... a consistent pattern of living on credit beyond the [Debtors'] means. At no point in the [Debtors'] history, either before or after filing for chapter 7 relief, ha[ve] the [Debtors'] shown a sincere resolve to repay [their] obligations and/or to reduce [their] monthly expenses. [Mr. McCormack] admits to making only minimum monthly payments so as to keep [Debtors'] account[s] current.

*Id.* The *Krohn* Bankruptcy Court had concluded:

> Such " 'free-wheeling spending is likely to put the [Debtors] in need of additional relief after several years.' " *In re Krohn*, 78 B.R. 829, 833 (Bankr.N.D.Ohio 1987) (quoting *In re Grant*, 51 B.R. 385 (Bankr. N.D.Ohio 1985)).

In our case, it appears that there was a consistent pattern of Debtors living beyond their means and Debtors' efforts at repayment apparently amounted to making minimum payments on an increasing number of credit cards over the years. Mr. Laman did work extreme hours at his three jobs, but it does appear that, unless Debtors get control of their spending, it likely will "put the [Debtors] in need of additional relief after several years." *In re Krohn*, 78 B.R. at 833. In fairness to the Lamans, however, the debtor in *Krohn* appeared to have some unsavory characteristics, which the Lamans do not, in any sense, possess. The Lamans appear to be conscientious debtors and parents who are over their financial head and need the benefit of financial advice and education.

### Conclusion

The Trustee's motion will be granted and the case will be dismissed if Debtors do not convert to Chapter 13 or 11 within ten days of entry of an order on this opinion.

Allowing these debtors to remain in Chapter 7 would give them a head start, rather

---

**2.** *See also, In re Carlton*, 211 B.R. at 478, where the court discusses a hybrid of the factors in

*Krohn*, 886 F.2d 123 and *In re Green*, 934 F.2d 568.

than a fresh start. It appears that they could make a sizeable Chapter 13 payment to their creditors in a three-year plan, without jeopardizing their family's welfare.

### *ORDER ON TRUSTEE'S § 707(b) MOTION*

For the reasons stated in the Memorandum Opinion signed this date, it is

**ORDERED** that this case will automatically be dismissed ten days from entry of this order, without further action by this Court, unless Debtors convert to Chapter 13 or 11 in the interim.

