**In re Irma Estrada RUBIO, Debtor.**

**No. 99–51295–7.**

United States Bankruptcy Court,
N.D. Texas,
Lubbock Division.

June 20, 2000.

it deems such necessary at a later time.

Becky Miller, Lubbock, TX, for debtor.

Deborah Penner, Lubbock, TX, trustee.

### *MEMORANDUM OPINION*

ROBERT L. JONES, Bankruptcy Judge.

The United States Trustee seeks dismissal of the Chapter 7 proceeding of Irma Estrada Rubio (Debtor) under § 707(b) of the Bankruptcy Code[1] as a substantial abuse of the provisions of Chapter 7. The Trustee contends that if the Debtor eliminated or reduced her repayment of a loan from her retirement plan and her payment

---

1. The Bankruptcy Code is 11 U.S.C. § 101 *et seq.*

of virtually all her daughter's college expenses, she has the ability to repay a substantial portion of her unsecured debts. Her "ability to pay", it is argued, constitutes a substantial abuse of Chapter 7 and warrants dismissal. The Debtor submits that such expenses are reasonable and necessary, that she is seeking relief under Chapter 7 in good faith, and dismissal is therefore inappropriate. The court concludes the Debtor does have the ability to make significant payments to her unsecured creditors and therefore the granting of relief to the Debtor would constitute a substantial abuse of the provisions of Chapter 7.

This matter is a core proceeding over which this court has jurisdiction to enter a final judgment. 28 U.S.C. §§ 1334 and 157(b). This Memorandum Opinion constitutes the court's findings of fact and conclusions of law. Rule 7052, F.R. Bankr.P.

### Facts

The parties submitted the following stipulations of fact:

1. Irma Estrada Rubio (Debtor) voluntarily filed for relief under Chapter 7 of the Bankruptcy Code on November 19, 1999.

2. Ms. Rubio is 58 years old. She was born in Ciudad Acuna, Coahuila Mexico, on September 13, 1941. She became a United States citizen on September 17, 1975. She has no dependents under the age of majority. She does, however, have a 21 year old daughter who, when this petition was filed, was living with her at her home. The Debtor is married to Jose Rubio. They have been married for 28 years. Mr. Rubio did not join in this petition.

3. The Debtor is employed by Covenant Medical Center as a registered nurse and a case manager. When this case was filed, she had been so employed for approximately 33 years. She has no reason to doubt her job's immediate security.

4. The Debtor listed on Schedule I $5,382.00 in gross monthly income. From that is deducted $971.06 for employment taxes and $279.64 for health, dental, and cancer insurance. This insurance covers Irma, her husband, and her daughter. Also deducted from gross monthly income is $576.38 per month for "Retirement" and $29.86 per month for the "United Way". The monthly net income stated in her Schedule I is $3,545.25. These amounts accurately reflect the Debtor's typical monthly income and deductions therefrom.[2]

5. Mr. Rubio is unemployed. He has been unemployed for approximately 8 years. He is currently seeking employment as a teacher. He is processing applications at South Plains College, Wayland Baptist and Lubbock Christian University. Mr. Rubio currently has no job prospects. Mr. Rubio resides with the Debtor. He did not, however, reside with the Debtor from 1996 to November 1999. During that period, he was living in Guadalajara, Mexico. This separation was not necessitated by serious marital discord or other matrimonial circumstance necessitating that he live apart from the Debtor. During their period of separation, Mr. Rubio cared for his parents in Guadalajara. Mr. Rubio's mother and father were both blind and elderly. In September 1998, Mr. Rubio's father passed away. Following his father's passing, Mr. Rubio continued to care for his mother. While residing in Mexico, Mr. Rubio attended the University in Guadalajara. During his absence, the Debtor sent approximately $12,000–$15,000 at approximately $500.00 per month to Mr. Rubio in Mexico for his support and discretionary spending.

6. The Debtor scheduled $8,927.41 in secured debts ... [which] is the mortgage on her house. Her house is located at 2416 39th Street, Lubbock, Texas, and is,

---

**2.** The court notes that these amounts do not "add up" and do not exactly match the amounts set forth on Schedule I. The differences, however, are not material. (*See* Debtor's Exh. 1).

according to Schedule A, valued at $26,884.00. Her payments on that mortgage are $283.00 and include real estate taxes and property insurance. She is current on the mortgage.

7. The Debtor scheduled no debts with priority. She listed on Schedule F, however, $68,402.28 in general unsecured debt. With the exception of the $4,223.29 debt owed to Plains National Bank on a signature loan, the amount owed is on debts the Debtor incurred using credit cards. Her unsecured debts are primarily consumer debts.

8. The Debtor's daughter is a student at Texas Tech University. She works part-time outside the home and contributes towards her own support by paying for some of her art supplies used in her art degree program at Texas Tech. The $112.84 per month auto insurance premium shown on Schedule J includes premiums on the 1984 Toyota Camry driven by Mrs. Rubio's daughter. The annual premium on her daughter's 1984 Toyota Camry is $339.00. If her daughter was not on the policy, the monthly expense for auto insurance would be approximately $84.59 per month.

9. The Debtor's schedule J shows a $700 per month expenses for food and $200 per month for clothing. These amounts include what is spent on these respective items for her daughter's consumption.

10. The Debtor's Schedule J includes a $630.00 per month expense for her daughter's college tuition and other related expenses. The tuition and fees for the Spring 1999 semester [were] $1,517.75. Tuition for the Summer 1999 semester was $594.60. The tuition and fees for the Fall semester of 1999 [were] $1,797.60. Mrs. Rubio's daughter began residing in the dorm in the Spring of 2000 at a cost of $1,443.00. The Debtor has not arranged with her daughter to have the amounts repaid when her college education is complete. The $630.00 per month includes tuition, fees, supplies and living expenses, and is in addition to the expenses the Debtor pays for her daughter's subsistence that are subsumed in the other scheduled expenses.

11. The Debtor also lists a $200.00 per month expense for "saving for trip to Mexico". However, when this case was filed, the Debtor had approximately $150.00 in cash or on deposit. The $200.00 per month expense labeled "saving for trip to Mexico" consists of $100–$150 sent to Mr. Rubio's mother in Guadalajara and a theoretical amount for travel to Mexico. Since the bankruptcy filing, the Debtor has sent funds to her mother-in-law, but has been unable to set aside funds for travel.

12. The Debtor's retirement plan at Covenant Medical Center is a 403(b) Tax Deferred Annuity through contract with Mrs. Rubio's employer, Covenant Medical Center (f/k/a Methodist Hospital). The contributions to that plan are voluntary. The monthly $576.58 payment is applied 100% to repaying the loan. The loan was taken in 1996 and was originally for $28,000. It was taken to pay credit card debts and to pay for her daughter to participate in "Up With People". The balance owing is approximately $20,545.00. The loan was to mature and be repaid on October 9, 2001.

13. The Debtor may or may not be "delinquent" on the repayments. The deductions from Irma's gross income have continued without interruption since she filed this case, and were thought to be automatically applied to the loan repayments. While the circumstances causing the apparent "delinquency" are unclear, the employer/hospital's recent merger may have effectuated without the Debtor's knowledge a change in where the deductions were being applied. Nevertheless, as of this hearing, there remains in the retirement account approximately $60,000.00. The money in this account, including the moneys "loaned" to the Debtor, was all deposited in that account prior to being subjected to any income tax withholding. Cesario Torres, Ms. Rubio's tax preparer

for over 15 years, has advised her that failure to repay the annuity loan will trigger a tax liability of $6,000 to $8,000.

14. The Debtor has fully cooperated with the United States Trustee in an audit of this case, and in supplying the United States Trustee with bank records, credit card statement, pay stubs, utility bills, etc.

15. The Debtor's circumstances have not materially changed since filing her bankruptcy petition. She has not elected to voluntarily convert this case to Chapter 13.

In addition to the above stipulations, Mrs. Rubio testified that, prior to filing bankruptcy, she did attempt to find other solutions to her financial troubles. She contacted the credit card companies in an effort to resolve her problems with them and also obtained consumer credit counseling. She further testified that she had not used a credit card since June 1999.

## Discussion

Section 707(b) provides that

the court, on its own motion or on a motion by the United States trustee ... may dismiss a case filed by an individual debtor ... whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

The parties have stipulated that Mrs. Rubio's debts are primarily consumer debts.

The Bankruptcy Code fails to provide any guidance on the meaning of substantial abuse as set forth in § 707(b). While the Fifth Circuit has yet to rule on the issue, several circuit courts and numerous bankruptcy courts have, however, addressed the issue of substantial abuse. Generally, two standards or means of analysis have emerged from case law in determining whether granting of relief would constitute a substantial abuse of the provisions of Chapter 7. These are: (1) The "totality of the circumstances" approach; and, (2) The debtor's "ability to pay" approach. *See In re Attanasio*, 218 B.R. 180 (Bankr.N.D.Ala.1998) (providing an exhaustive review of the case law on substantial abuse).

As any court's consideration of substantial abuse invariably involves a balancing of several facts and factors, a blending of the two standards frequently blurs the distinctions between the two approaches. The Ninth Circuit in *In re Kelly*, 841 F.2d 908 (9th Cir.1988) adopted the "ability to pay" analysis and, in so doing, asked whether the debtor could pay a substantial portion of his debts from future income in a hypothetical Chapter 13 case. *Id.* at 914–915. An affirmative answer to this question, standing alone, supports dismissal under § 707(b). *Id.* However, the debtor's inability to fund a Chapter 13 plan will not necessarily shield the debtor from § 707(b). *Id.* Evidence of bad faith on the debtor's part will also warrant dismissal. *Id.* The Ninth Circuit found no bad faith in *Kelly*, but did find the debtors could pay 99% of their unsecured debt over three years in a Chapter 13 case. Therefore, the court concluded dismissal by the bankruptcy court was justified. *Id.*

The Fourth Circuit in *In re Green*, 934 F.2d 568 (4th Cir.1991) adopted the "totality of the circumstances" approach. In so doing, the court announced five factors to consider in determining whether substantial abuse exists:

1. Whether the bankruptcy petition was filed due to sudden illness, calamity, disability, or unemployment;

2. Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

3. Whether the debtor's proposed family budget is reasonable;

4. Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect his true financial condition; and

5. Whether the petition was filed in good faith.

*Id.* at 572 (citations omitted).

██ According to the Fourth Circuit, a consideration of these factors will better equip the bankruptcy court in determining whether a debtor has filed his petition in good faith and whether he has the ability to repay a significant portion of his debt. *Id.* The court noted, however, that a finding that the debtor's income exceeds expenses will not support a finding of substantial abuse. *Id.* In effect, the Fourth Circuit requires a finding that the debtor's filing be abusive or, stated otherwise, lacking in good faith. *Id.* By requiring such a finding, the Fourth Circuit rejects *Kelly.* *Id.* Accordingly, in the Fourth Circuit, there must be evidence of both an ability to pay and lack of good faith to warrant a finding of substantial abuse and thus dismissal.

██ The Sixth Circuit in *In re Krohn,* 886 F.2d 123 (6th Cir.1989) held that if, upon consideration of the totality of the circumstances, the bankruptcy court finds the debtor to be dishonest or non-needy, relief should be denied. Factors to consider regarding the debtor's honesty are the debtor's good faith and candor in filing his schedules and other documents with the court; whether the debtor made several purchases on the eve of bankruptcy; and whether the debtor was forced to file because of unforeseen or catastrophic events. *Id.* at 126.

██ In determining want of need, the court considers the debtor's ability to repay his creditors out of future earnings which can itself justify dismissal; whether the debtor has a stable source of income; whether the debtor is eligible to file a Chapter 13 case; whether there are state remedies or private negotiations that the debtor can invoke to ease his financial predicament; and whether the debtor's expenses can be reduced without depriving the debtor of basic necessities. *Id.* at 126–127.

██ The court emphasized that the debtor's eligibility to file a Chapter 13 proceeding is not dispositive of whether substantial abuse exists. *Id.* at 127. However, a finding of bad faith can, standing alone, lead to dismissal. *Id.* In affirming the bankruptcy court's dismissal, the Sixth Circuit noted there was sufficient evidence of the debtor's bad faith given the debtor's long history of living beyond his means, his lack of sincere resolve to repay his debts or to reduce his monthly expenses, and his unreasonably extravagant lifestyle. The Court concluded the debtor had treated his creditors in a "callous" manner. *Id.*

In addressing the issue of substantial abuse, the bankruptcy courts in the Northern District of Texas have generally adopted the "totality of the circumstances" approach announced by the Sixth Circuit in *Krohn,* while borrowing certain factors from both *In re Kelly* and *In re Green.* See *In re Heasley,* 217 B.R. 82 (Bankr. N.D.Tx.1998) and *In re Laman,* 221 B.R. 379 (Bankr.N.D.Tx.1998).

In *In re Heasley,* the court used the "modified totality of the circumstances" test expressed in *Krohn,* but, to accommodate its analysis, addressed the factors outlined by the Fourth Circuit in *In re Green.* The bankruptcy judge found that the debtors had incurred cash advances and made consumer purchases far in excess of their ability to repay, that the accuracy of their schedules was questionable, and that there was, on balance, a lack of good faith because the debtors intended to reaffirm debt arising from use of fraudulently obtained credit cards while discharging the balance of their debts. *In re Heasley,* at 87–88. Finally, the court found the debtors could make substantial payments to creditors after comparing future income to future necessary expenses. *Id.* at 88. Accordingly, the court dismissed the case.

Similarly, the bankruptcy court in *In re Laman* used the "totality of the circum-

stances" test as expressed in *Krohn*, but, consistent with *In re Kelly*, emphasized the debtors' "ability to pay" as the primary factor. *In re Laman*, 221 B.R. 379, at 381. After consideration of the "primary" factor, the court examined the case in light of the *Krohn* factors, including: (1) Whether or not the debtors have a stable future income; (2) Whether the debtors were eligible to file Chapter 13; (3) Whether the debtors exhibited good faith and candor in filing their schedules and other documents; (4) Whether the debtors were forced into filing due to unforeseen or catastrophic circumstances; (5) Whether the debtors engaged in any "eve of bankruptcy" purchases; (6) Whether the debtors' expenses were reasonable; and (7) Whether the debtors could engage in some "belt tightening" without depriving themselves of adequate food, clothing, shelter, or other necessities. *Id.* at 385.

The court further found that in a Chapter 13 case, the debtors could repay approximately 25% of their unsecured debt over three years. *Id.* at 383. Although the court specifically found the debtors to be conscientious and to have exhibited good faith and candor in filing their schedules and other documents with the court, their "ability to pay" dictated a finding of substantial abuse and dismissal. *Id.* at 385.

■ Consistent with *Heasley* and *Laman*, this court likewise adopts a "totality of the circumstances" analysis. Upon a review of the "totality of the circumstances", the court will determine:

1. Whether the debtor has the ability to make significant payments to her creditors from future income, *see In re Laman*; and

2. Whether the debtor has exhibited a lack of good faith and honesty in her dealings with her creditors, *see In re Krohn*.

An affirmative finding on either will overcome the presumption in favor of granting relief[3] and warrant dismissal under § 707(b).

■ With respect to the Debtor's ability to pay, the court will determine whether the Debtor's financial predicament is such that she is in need of the relief afforded by Chapter 7, and, in so doing, will consider the following factors:

1. Whether the Debtor's schedules and statement of income and expenses reasonably and accurately reflect the Debtor's true financial condition, *In re Green* and *In re Heasley*;

2. Whether the Debtor has a stable source of future income, *In re Krohn* and *In re Laman*;

3. Whether the Debtor's expenses can be reduced without depriving her of adequate food, clothing, shelter, and other necessities, *In re Krohn* and *In re Laman*;

4. Whether the Debtor's family budget is excessive or unreasonable, *In re Green* and *In re Heasley*;

5. Whether the Debtor is eligible for filing under Chapter 13, *In re Green* and *In re Heasley*.

■ In determining whether the Debtor has exhibited a lack of good faith and honesty in dealing with her creditors, the court will consider the following factors:

1. The Debtor's accuracy and candor in preparing and filing her schedules and other documents with the Court, *In re Krohn*, *In re Heasley*, and *In re Laman*;

2. Whether the Debtor was forced to file the bankruptcy because of a sudden illness, calamity, disability, unemployment, or other such unforeseen circumstance.

---

**3.** The presumption favoring relief in § 707(b) has been described as a "statutory preference". *In re Krohn*, 886 F.2d 123 (6th Cir. 1989). The Ninth Circuit in *In re Kelly*, 841 F.2d 908 (9th Cir.1988) said the presumption "is in reality a caution and a reminder to the bankruptcy court that the Code and Congress favor the granting of bankruptcy relief, and that accordingly the court should give the benefit of any doubt to the debtor and dismiss a case only when a substantial abuse is clearly present". *Id.* at 917.

*In re Green, In re Krohn, In re Heasley,* and *In re Laman;* .

3. Whether the Debtor made several purchases on the eve of bankruptcy, *In re Krohn* and *In re Heasley;*

4. Whether the Debtor has exhibited a long history of living beyond her means, *In re Krohn;*

5. Whether the Debtor has engaged in a life style that is in excess of a reasonable standard of living, *Id.;*

6. Whether the Debtor has exhibited a sincere resolve to repay her debts or to reduce her monthly expenses, *Id.;*

7. Whether the Debtor has incurred cash advances and made consumer purchases far in excess of her ability to repay, *In re Green* and *In re Heasley.*

### Mrs. Rubio's Ability to Pay

The court will examine Mrs. Rubio's ability to pay in light of the factors set forth above. There is no evidence suggesting that Mrs. Rubio's schedules and statement of income and expenses are inaccurate. Indeed, the parties stipulated that Mrs. Rubio cooperated fully with the United States Trustee in furnishing him with records of her expenses.

Mrs. Rubio has a stable source of future income. She is employed as a registered nurse, and there is no evidence of job insecurity.[4] Mrs. Rubio draws a gross monthly income of $5,382.00 from which is deducted $971.06 for employment taxes, $279.64 for health, dental, and cancer insurance, $576.38 for "Retirement", and $29.86 for "United Way". The monthly net income is $3,545.25.[5] Mrs. Rubio is 58 years old and, while there is some evidence of ill health[6], there is no reason to question her continued employment for several more years as a registered nurse.

With two exceptions, Mrs. Rubio's expenses do not appear to be susceptible to reduction.[7] This assumes, according to Mrs. Rubio's testimony, that she has ceased supporting her husband's forays to Mexico to the extent of $500.00 a month. The two expenses that raise concern are the $630.00 a month that Mrs. Rubio pays for her daughter's college expenses and the $576.58 a month she pays to repay a loan from her retirement plan.

■ Mrs. Rubio's daughter attends Texas Tech University and lives in the dorm. There is some evidence that the daughter helps pay for her school supplies. The Rubios live within ten minutes of the Texas Tech campus. The court concludes that the extent of Mrs. Rubio's support of her daughter's education, while admirable and justified under normal circumstances, is not appropriate for a person in Mrs. Rubio's financial predicament. This expense can be cut, especially the cost of living in the dorm, without depriving either Mrs. Rubio or her daughter of any necessities.

■ The repayment of the loan to Mrs. Rubio's retirement plan is also inappropriate given Mrs. Rubio's circumstance. It is essentially a repayment to herself and is not necessary or reasonable for one seeking Chapter 7 relief. *In re Watkins,* 26 B.R. 394, 396 (Bankr.W.D.Tx.1997) (holding that voluntary retirement contributions cannot be excluded from disposable income); *In re Mills,* 246 B.R. 395 (Bankr. S.D.Ca.2000); *In re Cohen,* 246 B.R. 658 (Bankr.Colo.2000). In *Mills,* the bankruptcy court held that a retirement plan contribution is reasonably necessary for the debtor's support and maintenance, but a monthly $146.00 401(k) loan repayment

---

4. Since Mr. Rubio has been unemployed for approximately eight years and, given he is not a debtor before the court, the court does not consider his unemployment as affecting the stability of Mrs. Rubio's future income.

5. See footnote 2.

6. Mrs. Rubio testified that she occasionally suffers from shingles.

7. In addition, the United States Trustee did not question any other expenses of Mrs. Rubio.

is not. After adjusting the debtor's monthly disposable income to include the $146.00 in disposable income, the court concluded that based upon the debtor's ability to repay a substantial amount of his debt, relief to the debtor under Chapter 7 would be a substantial abuse of Chapter 7. In *Cohen* the bankruptcy court found that the debtor's 401k savings contributions *and* loan repayments are not necessary for the debtor's support and maintenance. *Id.* at 27. The court held it was "anomalous and inequitable to allow her to commit part of her earnings to the payment of her own retirement fund—in which the debtor, as of the date of the debtor's filing, has accumulated the sum of approximately $70,000.00—and pay her unsecured creditors nothing". *Id.*

Mrs. Rubio testified that she is concerned that her failure to repay the loan will trigger adverse tax consequences. There is the possibility that the loan balance will be deemed a distribution to Mrs. Rubio thereby creating taxable income to Mrs. Rubio. (Debtor's Exh. 2). The court will not opine on the tax consequences of a default in repaying the loan or whether any such adverse tax consequences can be minimized in Chapter 13. However, it is clear that a portion of the $576.58 presently being repaid could be used to satisfy any taxes.

As the court finds that Mrs. Rubio's payment of her daughter's college expenses and repayment of the loan from her retirement plan are excessive, the court must further conclude that Mrs. Rubio's family budget is not reasonable.

A review of Mrs. Rubio's schedules reflects she is eligible to file a Chapter 13 proceeding.

▮ If the payments to her retirement plan and for her daughter's college expenses are reduced or eliminated, Mrs. Rubio's budget will generate disposable income [8] that can be used to make significant payments to her unsecured creditors.

*In re Laman,* 221 B.R. 379, 384 (Bankr. N.D.Tx.1998) (substantial abuse exits where debtors "have the ability to pay a significant dollar amount to the unsecured creditors, irrespective of percentage"). The court will not attempt to determine the amount of payment or the percentage that unsecured creditors would receive in a Chapter 13 case. If both payments are eliminated, Mrs. Rubio would have approximately $1,200.00 added to her budget. However, the court would not expect Mrs. Rubio to cease all support of her daughter's education. In addition, the court does not discount the possibility that Mrs. Rubio may incur additional taxes if she defaults on the loan repayment.

The court therefore concludes that Mrs. Rubio does have an ability to make significant payments to her creditors and therefore is not in need of Chapter 7 relief. As stated above, this alone warrants dismissal under § 707(b).

### Mrs. Rubio's Lack of Good Faith and Honesty

▮ Given the court's finding that Mrs. Rubio's ability to pay, taken alone, warrants dismissal, it is not necessary to determine whether Mrs. Rubio has exhibited a lack of good faith and honesty in dealing with her creditors therefore justifying dismissal. However, to complete the analysis, the court will review the facts of this case in light of the factors outlined above in determining lack of good faith and honesty.

Mrs. Rubio, as stated above, was accurate and candid in her schedules and other documents filed with the court. Her filing was not caused by any sudden illness, calamity, disability, unemployment, or other such unforeseen circumstance. To the contrary, it appears to have been caused by her supporting her husband's lengthy trips to Mexico, supporting her daughter well beyond normal necessities, and generally abusing credit cards. These spending habits do not, standing alone, evidence a

8.  See 11 U.S.C. § 1325(b)(2)(A).

lack of good faith or honesty on Mrs. Rubio's part. They do, however, evidence a long history of living beyond her means. There is no evidence of excessive eve-of-bankruptcy purchases by Mrs. Rubio. Indeed, the court does not consider Mrs. Rubio's lifestyle to be extravagant; it is simply excessive and inappropriate given her income relative to such expenditures.

Upon filing her petition, Mrs. Rubio had in excess of $60,000 in credit card debt. One stated purpose of the $28,000.00 loan from Mrs. Rubio's retirement plan was to pay credit card debts. If in fact the funds were, at least in part, so used, either her debts then well exceeded her debts at the time of filing her petition, or she continued to incur credit card debts after obtaining the loan. Mrs. Rubio testified she has not used a credit card since June 1999. She also attempted to negotiate a resolution with the credit card companies and sought consumer credit counseling prior to filing. While her efforts may have failed, they are evidence of a sincere resolve to repay her debts or to reduce her monthly expenses. Finally, as virtually all of Mrs. Rubio's debts constitute consumer debts, she has clearly incurred cash advances and made consumer purchases far in excess of her ability to pay.

Having considered the foregoing factors in light of the statutory presumption favoring relief, the court finds that, on balance, Mrs. Rubio has exhibited good faith and honesty in her filing.

### Conclusion

As the court finds Mrs. Rubio has the ability to make significant payments to her unsecured creditors, the Trustee's motion will be granted, and the case will be dismissed if the Debtor does not convert to Chapter 13 or 11 within ten days of entry of an order on this Opinion. The court will prepare an order.